**Natalie MINOTT, Plaintiff,**

v.

**THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendant.**

**No. 97 CIV. 7127(RWS).**

United States District Court, S.D. New York.

Oct. 17, 2000.

Mandy R. Steele, East Brunswick, NJ, for Plaintiff.

Milton H. Pachter by Gerald R. Drasheff, New York City, for Defendant.

## OPINION

SWEET, District Judge.

Defendant the Port Authority of New and New Jersey (the "Port Authority") has moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order of summary judgment dismissing the complaint of plaintiff Natalie Minott ("Minott") alleging gender, race, and disability-based employment discrimination, and retaliation for her opposition to these discriminatory employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII") and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112–12117 (the "ADA").

For the reasons set forth below, the motion will be granted.

### The Parties

Minott was a probationary police officer employed in the Port Authority's Public Safety Department from November 1, 1993 until her termination on April 28, 1995.

The Port Authority is a bi-state agency created by compact in 1921 between the States of New York and New Jersey with the consent of the Congress of the United States.

### Prior Proceedings

Minott filed this action on August 18, 1997. Minott had previously filed a charge alleging gender and race discrimination and retaliation by the Port Authority with the New York Office of the Equal Employment Opportunity Commission ("EEOC") on May 1, 1995, and an identical charge with the Newark, New Jersey Area Office of the EEOC on January 22, 1996. The EEOC issued a "Right To Sue" letter on May 23, 1997, in which the agency notified Minott that it was terminating its processing of her charge and that she had 90 days within which to sue in the United States District Court.

The parties engaged in discovery, exchanging documents and deposing witnesses. The instant motion was filed on June 13, 2000, and oral argument was heard on June 21, 2000, at which time the matter was deemed fully submitted.

### Facts

The facts set forth below are gleaned from the parties' Rule 56.1 statements,

affidavits, and exhibits, with any factual inferences drawn in Minott's favor. They do not constitute findings of fact by this Court.

Minott was a probationary police officer employed in the Port Authority's Public Safety Department from November 1, 1993 until she was terminated on April 28, 1995. Minott was assigned to the Port Authority Police Academy (the "Police Academy") from November 1, 1993 to April 29, 1994. Minott successfully completed the prescribed training at the Police Academy and, following her graduation on April 29, 1994, was assigned as a probationary police officer to the Port Authority Bus Terminal (the "Bus Terminal").

In February 1994, Minott was informed by her physician that she was pregnant. At that time she was still at the Police Academy. She did not inform anyone at the Port Authority about her pregnancy until she completed the Police Academy. She informed her commanding officer at the Bus Terminal, Captain Anthony Infante ("Infante"), about her pregnancy immediately upon completing her first tour of duty there on or about May 3, 1994.

Prior to completing her probationary period, that is, from the period November 1, 1993 through April 18, 1995, Minott was absent due to illness on seven occasions for a total of 30 work days. She was absent on five or more occasions within a twelve month period, whether calculated as spanning from November 1993 to November 1994, or from March 1994 to March 1995. One of these absences, from May 10, 1994 to May 24, 1994, was due to a miscarriage. This absence was noted in the Port Authority's records as pregnancy-related. Four other officers, all of whom were either male or female but not pregnant, from Minott's recruit class had a higher total number of days absent due to illness prior to completing their probation period, namely: Officer Ashton ("Ashton") (31

work days); Officer Dubiel ("Dubiel") (66 work days); Officer Fasano ("Fasano") (75 work days); and Officer Way ("Way") (65 work days).

While assigned to the Police Academy, Minott received a written counseling memorandum dated April 4, 1994 concerning her absence record. Minott was counseled after her assignment to the Bus Terminal by a memorandum dated June 15, 1994, regarding three absences, including the two which occurred while she was at the Police Academy; by a memorandum dated August 19, 1994, regarding an additional absence; and by a memorandum dated November 28, 1994 regarding an additional absence. In November 1994, Minott's scheduled in-grade salary increase was deferred. According to a memorandum dated November 2, 1994 and issued by William Hall ("Hall"), Deputy Inspector and Commanding Officer for the Bus Terminal, the reasons for this salary increase deferral were that she had been counseled on June 24, 1994 for three sick occasions and on August 23, 1994 for four sick occasions,[1] and that there was a pending memorandum of complaint against her for being absent without leave on three occasions.

On January 5, 1995, Minott was served with charges for "Stage I" discipline for "Repeated and Excessive Absence" under the Memorandum of Agreement between the Port Authority and the Port Authority Police Benevolent Association Inc. (the "Union Contract"). Stage I discipline is triggered by two or more non-exempt occasions of absence in a consecutive nine-month period totaling 18 or more days absent. Under the Union Contract, certain absences due to work-related injuries are exempt. Minott had two work-related absences which were ultimately classified as non-exempt. One of these absences, from September 7, 1994 to September 8, 1994 was initially classified as exempt and

---

**1.** The record evidence is that the June 24, 1994 counseling corresponds to the June 15, 1994 memorandum, and the August 23, 1994 counseling corresponds to the August 19, 1994 memorandum, so that these counselings do not represent additional absences on Minott's part.

then later reclassified. Her absence record brought her within the provisions of Stage I discipline even if her work-related absences are disregarded.

None of the four officers who had a higher total number of days absent prior to completing their probationary period were disciplined or terminated based on their absences. However, with the exception of Way, the majority of these officers' absences—both in terms of the number of days absent and the number of occasions of absence—were classified as exempt because they resulted from injuries sustained in the line of duty. Way's absences, which were non-exempt, occurred on: February 11, 1994 to February 13, 1994 (1 work day), December 25, 1994 to December 29, 1994 (3 work days), and January 6, 1995 to April 8, 1995 (61 work days).

During her employment Minott consistently received performance evaluations of "meets standard" or better in every rated category. In an evaluation dated March 5, 1995, approximately six weeks before her termination, Minott received an evaluation stating "Officer Minott is a good police officer. She is dependable and works well with others." However, Minott also received an evaluation on March 7, 1995, in which it is stated that "While capable of performing the duties of police officers, Officer Minott continues to have attendance problems."

During the period in which Minott was attending the Police Academy, one of the supervisory officers, Detective James Verdino, commented to a Police Academy class that "[T]hese days they will pull an indian out of the tee-pee to satisfy quota requirements and anybody is now getting this job," and commented to Minott that one of the reasons Minott was being considered for employment with the Port Authority was that she was a black woman. Also during this period, Minott heard other members of her recruit class comment that women were not suited for police work. Minott complained informally to several supervising officers. The response of these officers was essentially that such

comments were par for the course and that police work is a man's job. At one point during Minott's training at the academy, one of her supervising officers, Lieutenant Durett, who is a woman, commented to Minott and a group of other women recruits that women are held to a higher standard than men within the Port Authority.

During her training at the Police Academy, one of the instructors told Minott that her pants were not dark enough even though they were purchased at an authorized uniform store. Also during this time, she and other women cadets were required to remove their shirts in the common waiting room, which was not blocked to males, to receive a vaccination.

Minott found a copy of a racially offensive joke in her mailbox at the Bus Terminal on February 15, 1995. The commanding officer distributed a memorandum to the staff on the following day, calling the memorandum to their attention and stating that any member of the force involved in such activity would be subject to disciplinary action.

On September 29, 1995, the EEOC issued a determination that there was reasonable cause to believe that the Port Authority had discriminated against female employees with pregnancy-related conditions through its policies/contract governing the forfeiture of vacation time based on the use of extended periods of sick leave by those employees.

In a memo dated March 27, 1995, Charles Knox ("Knox"), Director of the Port Authority Public Safety Department, recommended to the Director of the Port Authority Human Resources Department that Minott's employment be terminated based on her absence and lateness record. Minott was terminated on April 28, 1995.

Prior to Minott's termination, she had not filed a complaint with Port Authority's Office of Equal Opportunity. She had voiced concerns about her treatment, including her belief that she was being treat-

ed in a discriminatory manner, to Sergeant Michelle Grabley ("Grabley"), who was in charge of the Women's Law Enforcement Association. On April 10, 1995, Minott visited the offices of the EEOC prior to her termination and spoke with an EEOC employee. Minott told Grabley prior to her termination that she was going to file a charge with the EEOC. She did not tell anyone else within the Port Authority.

### Discussion

#### I. *Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Additional considerations factor into a summary judgment motion in an employment discrimination action. *See Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir. 1989); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *See Gallo*, 22 F.3d at 1224. This does not suggest, however, that summary judgment is never appropriate in an employment discrimination action. The Second Circuit has made clear that the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir.1994); *see Meiri*, 759 F.2d at 998.

Where no evidence exists or only conclusory allegations of discrimination have been offered to suggest that an employer's motives are improper, summary judgment may be appropriate. *See Meiri*, 759 F.2d at 998; *see also Woroski v. Nashua Corp.*, 31 F.3d 105, 109–10 (2d Cir.1994). After all, a party seeking to defeat a summary judgment motion cannot rely upon "conclusory allegations or denials," but rather

must set forth "'concrete particulars'" showing that a trial·is needed. *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (*quoting R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984)). Mere speculation or conjecture as to the true nature of facts cannot overcome the motion. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). The responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

## II. *The Legal Standards Governing Title VII*

Title VII makes it unlawful "for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] sex ...." 42 U.S.C. § 2000e–2(a)(1). The Pregnancy Discrimination Act (the "PDA") provides that the prohibition of sex-based employment discrimination applies with equal force to discrimination on the basis of "pregnancy, childbirth, or related medical conditions," and "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). The analysis required for a pregnancy discrimination claim is the same as the analysis used in other Title VII sex discrimination suits. *See Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1312–12 (11th Cir.1994).

The "ultimate issue" in any employment discrimination case is "whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason.'" *Stratton v. Department for the Aging,* 132 F.3d 869, 878 (2d Cir. 1997). The basic framework for Title VII discrimination claims is the three-step burden shifting analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell,* the plaintiff has the initial burden of establishing a *prima facie* case of unlawful race discrimination by showing that the plaintiff is: (1) a member of a protected class, (2) who was qualified for her position, (3) who suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *See McDonnell,* 411 U.S. at 802, 93 S.Ct. 1817; *Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir. 1998); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The requirements for establishing a *prima facie* case are not onerous. *See Hicks,* 509 U.S. at 506, 113 S.Ct. 2742; *Austin,* 149 F.3d at 152.

If a plaintiff makes out a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory purpose for the adverse employment decision. *See McDonnell,* 411 U.S. at 802, 93 S.Ct. 1817; *Austin,* 149 F.3d at 153; *Woroski,* 31 F.3d at 108. "This burden is one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

Once the employer articulates such a purpose, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the "employer's proffered reasons are shown to be a pretext for discrimination." *Austin,* 149 F.3d at 153 (citations omitted). The presumption of discrimination "drops out of the picture" once the defendant meets its burden of production. *See Reeves,* —— U.S. at ——, 120 S.Ct. at 2106 (*quoting St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). However, the trier of fact may consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn

therefrom" in determining whether the defendant's explanation is pretextual. *See Reeves*, —— U.S. at ——, 120 S.Ct. at 2106 (*quoting Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255, n. 10, 101 S.Ct. 1089 (1981)). Indeed, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit a jury to find intentional discrimination. *See Reeves*, —— U.S. at —— – ——, 120 S.Ct at 2108–09.

■ Title VII also provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful practice by this subchapter ...." 42 U.S.C. § 2000e–3(a). As the Second Circuit has noted, "[t]he objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988). To establish a claim for retaliation pursuant to Title VII, a plaintiff need not prove that her discrimination claim was valid in the first instance. *See Sumner v. U.S. Postal Service*, 899 F.2d 203, 208–09 (2d. Cir.1990).

Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding. *See Gilani v. National Ass'n of Securities Dealers, Inc.*, No. 96 CV 8070, 1997 WL 473383, at *7 (S.D.N.Y. Aug. 19, 1997) (*citing Williams v. Boorstin*, 663 F.2d 109, 115 (D.C.Cir. 1980)).

■ A *prima facie* case of retaliation under Title VII requires a showing that (1) the employee was engaged in an activity protected under Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) there was an employment action that disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. *See Tomka*, 66 F.3d at 1308; *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir.1993); *Burrell*, 894 F.Supp. at 760. The requisite causal connection may be established "indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan*, 842 F.2d at 593 (*citing Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986)).

If a plaintiff makes such a showing, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. *See Tomka*, 66 F.3d at 1308. If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for retaliation. *See Tomka*, 66 F.3d at 1308.

### III. *The Sex Discrimination Claim*

#### A. *There Are No Triable Issues Of Fact With Respect To Minott's Unlawful Termination Claim*

Minott easily satisfies the first three prongs of the McDonnell test. First, she was a member of a protected class, namely, she is a woman and she was pregnant. Second, she was qualified for her position, as evidenced by her performance evaluations. Third, she suffered an adverse employment action, namely, termination.

With respect to the fourth prong, that is, whether the circumstances give rise to an inference of discrimination, Minott relies on what she alleges was differential treatment of individuals who were similarly-situated as to their absenteeism, but who were not female and not pregnant. Specifically, she points to the fact that other members of her recruit class had a greater number of total days absent prior to the end of their probationary period and yet were not disciplined or terminated on this basis.

Although as discussed below the evidence as to Minott's differential treatment

is very weak, it will be assumed *arguendo* that Minott has met the de minimis burden necessary to state a *prima facie* case. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995); *Velasquez v. Goldwater Memorial Hosp.*, 88 F.Supp.2d 257, 261 (S.D.N.Y.2000); *see also Griffin v. Ambika Corp.*, 103 F.Supp.2d 297, 307 (S.D.N.Y. 2000) (assuming prima facie burden met and noting that *Reeves* decision eliminates potential distinction between evidence used to meet prima facie burden and evidence used to show pretext). The Port Authority has articulated a legitimate, non-discriminatory motivation behind Minott's termination, namely, that she was fired based on her well-documented absenteeism. Thus, the burden shifts back to Minott to demonstrate that the proffered non-discriminatory reason was merely a pretext for discrimination.

■ Title VII and the Pregnancy Discrimination Act do not protect a pregnant employee from being discharged for absenteeism even if her absence was due to pregnancy or complications of pregnancy, unless other employees are not held to the same attendance standards. *See Troupe v. May Dep't Stores*, 20 F.3d 734, 738 (7th Cir.1994); *Fisher v. Vassar College*, 70 F.3d 1420, 1448 (1995) reheard on banc on other grounds, 114 F.3d 1332, abrogated on other grounds by *Reeves*, —— U.S. ——, 120 S.Ct. 2097, 147 L.Ed.2d 105; *Reilly v. Metro–North Commuter R.R. Co.*, 93 Civ. 7317, 1996 WL 665620, at *8 (S.D.N.Y. Nov. 15, 1996).

■ Minott contends that a comparison between her absenteeism record and Ashton, Dubiel, Fasano, and Way shows disparate treatment. However, in the case of three of those officers the comparison is inapposite because their absences were due primarily to work-related injuries which were classified as exempt for purposes of absenteeism-related discipline. Thus, these officers' absences were not being treated more leniently than were Minott's absences. Rather, they were not subject to discipline under a policy applicable to all officers, including Minott.

■ In the case of Officer Way, however, the absences were not work-related. Way was absent on three occasions, including two occasions with a nine-month period totaling 64 days. Thus, Way was absent on fewer occasions than was Minott, but for a larger total number of days. Way was not disciplined for his absences even though he could have been according to the Stage I discipline provision, because he was absent on two non-exempt occasions of absence in a consecutive nine-month period for more than a total of 18 days.

Nonetheless, Minott's absence record was more severe than all of the other officers in her class, including Way, because she was the only one who failed to meet two of the absenteeism standards prior to the conclusion of her probationary year. One of these standards is the Sick Leave Policy under the Union Contract, according to which an officer who is absent on five or more separate occasions in a period of twelve months is classified as "Below Standard." Minott's absence record fell within this category. The other standard is the Stage I discipline provision. Although Way was treated more favorably than Minott, in that he could have been but was not charged with Stage I discipline, he still only failed to meet one standard rather than two.[2] Thus, Minott's record was more severe than the records

---

2. In the materials submitted in support of its motion the Port Authority overstates Minott's absenteeism record by asserting that it was "Below Standard" because it involved seven occasions for a total of 30 work days. These seven absences, however, occurred over a fifteen and a half month period, whereas according to the policy the relevant period is twelve months. Exaggeration of an employee's absenteeism record is some evidence of discriminatory intent where the employer was ostensibly fired for absenteeism. *See Pendarvis v. Xerox Corp.*, 3 F.Supp.2d 53, 57 and n. 3 (D.D.C.1998). However, when the inquiry is properly confined to a twelve-month period, Minott was still absent on five separate occasions within a twelve-month period.

of all the other members of her recruit class.

Minott also contends that her absences were treated differentially in that her work-related injury absences were counted against her, while those of the male officers were classified as exempt. However, Minott fails to provide any information concerning her two work-related absences from which a fact finder could determine whether or not the exemption policy was applied in a non-uniform manner. The evidence does show that on one occasion Minott had an absence that was initially classified as exempt and then within weeks of her termination was reclassified as non-exempt. However, although this timing is suspect, neither the memorandum recommending her termination nor the materials upon which that memorandum relies reference this absence.[3] Thus, the timing of the reclassification of this absence as non-exempt does not support an inference of discriminatory intent as to Minott's termination.

Finally, Minott points to a September, 1995 letter by the EEOC to the Port Authority notifying it of the EEOC's determination that there was reasonable cause to believe that the Port Authority was discriminating against pregnant female employees in the administration of its sick leave policy. That determination did not arise out of Minott's case, however, nor did it involve the same disciplinary provisions applied to her absenteeism. Rather, that determination was made in relation to charges brought by the Women's Law Enforcement Association with respect to the Port Authority's administration of its vacation forfeiture policy. Although the matters dealt with in the EEOC complaint were closely-related as to their subject, this is not sufficient evidence from which a

reasonable fact finder could conclude that the Port Authority's asserted reason for firing Minott was pretextual.

In sum, drawing all inferences in favor of Minott, Minott has failed to set forth sufficient evidence to raise a triable issue of fact as to whether her termination was motivated by discriminatory intent relating to her sex/pregnancy. Therefore, this claim will be dismissed.

**B. Minott's Claims For Events Occurring Before November 1, 1994 Are Time–Barred**

A Title VII plaintiff must file a complaint with the EEOC within 180 days of when she knew or had reason to know of the alleged unlawful employment action or, if she has already filed a charge with the relevant state or local equal employment agency, within 300 days of that action. See 42 U.S.C. § 2000e–5(e); Cornwell v. Robinson, 23 F.3d 694, 703–04 (2d Cir.1994) (citations omitted); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712–13 (2d Cir.1996). If a plaintiff fails to meet the applicable statute of limitations her claim will not be actionable in federal court. See Cornwell, 23 F.3d at 703–04. In this case, the applicable time period is 180 days because neither the New York nor New Jersey state anti-discrimination agencies have jurisdiction over the Port Authority. See Dezaio v. Port Authority of New York and New Jersey, 205 F.3d 62, 64 (2d Cir.2000) (Port Authority employee subject to 180–day EEOC filing rule because neither New York anti-discrimination law nor New York State Division of Human Rights' jurisdiction extends to Port Authority); King v. Port Auth. of New York & New Jersey, 106 F.3d 385 (3d Cir.1996), aff'g 909 F.Supp. 938, 945

---

**3.** The March 27, 1995 memorandum recommending Minott's termination references three instances on which Minott was counseled for her absences. In the counseling memoranda corresponding to these instances, the September 1994 work-related absence was treated as exempt, and the March 27, 1995 memoranda does not indicate otherwise.

In an April 18, 1995 internal report of the absences for all members of Minott's recruit class, however, this same absence was classified as non-exempt. Thus, it appears that the reclassification occurred after the recommendation to terminate Minott had already been made.

(D.N.J.1995) (New Jersey anti-discrimination law does not apply to Port Authority).

There is a continuing-violation exception to the statute of limitations which "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the state of limitations." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (internal quotation marks and citation omitted). A continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell*, 23 F.3d at 704.

Minott filed a charge with the New York office of the EEOC on May 1, 1995, so that the 180–day period began on November 1, 1994. Thus, only events occurring after November 1, 1994 are actionable under Title VII, absent application of the continuing-violation exception.

All of the alleged incidents of discrimination during Minott's training at the Police Academy occurred before November 1, 1994. The continuing violation exception does not apply to these events because she was not subjected to an ongoing and consistent policy of adverse conduct by the Port Authority during that time. On the contrary, she completed her course of study at the Police Academy, was hired by the Port Authority, and was assigned to a field command as a probationary police officer.[4] Therefore, the only event for which she may bring a claim of gender discrimination is her termination.

### C. There Is No Triable Issue Of Fact With Respect To Minott's Hostile Work Environment Claim

Minott contends that she was subjected to a hostile work environment based on her gender and race. This contention is based on her allegations concerning certain comments made to her or in her presence, the fact that she was told her pants were not dark enough even though they were purchased at an authorized uniform store, the fact that she and other women cadets were required to remove their shirts in the common waiting room, which was not blocked to males, to receive a vaccination, and the racially offensive joke which was left in her mailbox.

An employer will be liable under Title VII for permitting a discriminatory hostile work environment, that is, a "workplace [that is] permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal references omitted); *see Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 436 (2d. Cir. 1999). "The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997). Conduct that is "merely offensive, unprofessional or childish is not discriminatory conduct proscribed by Title VII." *Cosgrove v. Federal Home Loan Bank of N.Y.*, Nos. 90 Civ. 6455, 92 Civ. 4225 (RPP), 1999 WL 163218, at *20 (S.D.N.Y. Mar. 23, 1999).

Factors to be considered when determining whether an environment is hostile or abusive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

As with a Title VII claim alleging a discriminatory adverse employment decision, a plaintiff in a hostile environment

---

**4.** Indeed, the lack of any adverse employment action would also be fatal to Minott's ability to establish a prima facie case of discrimination based on these events.

**524**

case must demonstrate that there are circumstances giving rise to an inference of discriminatory intent behind the abusive conduct. *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

With the exception of the racially offensive joke Minott found in her mailbox, all of the allegedly comments and conduct occurred prior to November 1, 1994. As explained above, these incidents are not actionable because they do not fall within the continuing violation exception. Moreover, even if they were actionable, they were not sufficiently severe to rise to the level of a Title VII violation. With respect to the racially offensive joke, the commanding officer at the Port Authority promptly took appropriate corrective action by distributing a memorandum to all staff condemning the act. Nor is there any evidence that supervisory personnel were involved in distributing the joke. Therefore, there is no triable issue of material fact with respect to Minott's hostile work environment claim, and that claim will be dismissed.

### D. There Is No Triable Issue Of Fact With Respect To Minott's Retaliation Claim

In order to make out a *primafacie* case of retaliation, as explained above, Minott must show that: she was engaged in a protected activity; her employer was aware of her activity; she was subject to an adverse employment action; and there was a causal connection between her protected activity and the adverse action. *See Tomka,* 66 F.3d at 1308.

Protected activity includes participation in a Title VII investigation and proceeding as well as opposition to an employment practice that is unlawful under Title II. *See* 42 U.S.C. § 2000e–3(a); *Sumner,* 899 F.2d at 208–09. Informal as well as formal complaints, including complaints to management, constitute protected oppositional activity. *See Sumner,* 899 F.2d at 209.

Minott has not made a sufficient showing as to her retaliation claim. First, although Minott did complain informally to her superiors while she was at the Police Academy, she suffered no adverse employment action as a result. On the contrary, she completed her training and was hired by the Port Authority. Second, although Minott visited the offices of the EEOC prior to her termination, on April 10, 1995, she had made no showing that anyone involved in the decision to terminate her in April 1995 was aware that she had taken any steps towards filing a complaint with the EEOC. Minott herself says that the only person she told was the officer in charge of the Women's Law Enforcement Association. Therefore, she has not made a showing from which a reasonable jury could conclude that her employer was aware of her activity and that there was a causal connection between that activity and her termination.

### IV. The Race Discrimination Claim

Minott has raised no triable issue of fact with respect to her race discrimination claim. First, the comments by Verdino were made during her Police Academy training and are therefore time-barred. In any event, they do not rise to the level of a Title VII violation since they resulted in no adverse employment action. The commanding officer at the Bus Terminal responded to the circulation of the racially discriminatory joke by issuing a memorandum condemning it. Nor is there any evidence that supervisory personnel had anything to do with the distribution of the joke. Therefore, this incident does not support a claim for racial discrimination by the Port Authority, and that claim will be dismissed.

### V. The ADA Claim

Minott alleges that the Port Authority violated the ADA, which prohibits discrimination in employment on the basis of a person's disability, *see* 42 U.S.C. § 12112(a), by discriminating against her

on the basis her pregnancy. In her complaint to the EEOC, however, Minott did not allege that she had suffered disability-related discrimination. Although the Port Authority has not challenged Minott's ADA claim on this basis, this discrepancy raises a question as to whether Minott has met the condition precedent of filing a complaint with the EEOC with respect to her ADA claim.

A district court may consider "those claims 'reasonably related to the allegations in the [plaintiff's EEOC] complaint.'" *Gomes v. Avco Corp.*, 964 F.2d 1330, 1334 (2d Cir.1992) (modification in original), *quoting Kirkland v. Buffalo Bd. of Educ.*, 622 F.2d 1066, 1068 (2d Cir.1980) (per curiam). If the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination" would encompass the claim, then that claim is reasonably related to the EEOC complaint. *Id.; see Shull v. Rite Aid Corp.*, No. 94 Civ. 8552, 1997 WL 289460, at *7 (S.D.N.Y. May 30, 1997).

Neither party has cited any authority regarding the question of whether a plaintiff may bring an ADA suit based on the same events which were the basis of a gender and race discrimination complaint filed with the EEOC. However, assuming *arguendo* that this Court could consider Minott's ADA claim, that claim must be dismissed as a matter of law because Minott has not shown that she suffered from a disability within the meaning of the ADA.

Every court to consider the question of whether pregnancy in and of itself is a "disability" within the meaning of the ADA has concluded that it is not.[5] *See Conley v. United Parcel Service*, 88 F.Supp.2d 16, 19; *Martinez v. N.B.C. Inc. and M.S.N.B.C. Inc.*, 49 F.Supp.2d 305, 309 (S.D.N.Y.1999) (citing cases). The reasoning of those courts is adopted herein. Minott did suffer complications result-

ing from her pregnancy, namely, a miscarriage. However, courts have held only in extremely rare circumstances that complications arising from pregnancy constitute a disability under the ADA. *See Conley*, 88 F.Supp.2d at 19 (citing cases). Minott has made no showing as to why her miscarriage should be considered a disability within the meaning of the ADA. *See id.* (miscarriage is not per se disability under ADA). Therefore, this claim will be dismissed.

### Conclusion

Therefore, for the reasons set forth above, the motion for summary judgment is granted.

It is so ordered.

---

5. A person is "disabled" under the ADA where that person: (i) has a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2).