Ian M. BERKOWITZ, Plaintiff,

v.

COUNTY OF ORANGE, Orange County Human Rights Commission, Hubert Lee, Angela Colonna, Carol Chichester, Mary Simmons, Graham Skea, Fran Turi, Christopher Sherwood, Carla Carlson, Theodore Catletti and John and/or Jane Doe 1–10 (said names being fictitious and unknown and meant to designate employees of the County of Orange and Orange County Sheriff's Department), Defendants.

No. 99 CIV. 1579(WCC).

United States District Court, S.D. New York.

Nov. 8, 2000.

Dupeé, Dupeé & Monroe, P.C., Goshen, NY (James E. Monroe, Of Counsel), for Plaintiff.

Drake, Sommers, Loeb, Tarshis & Catania, P.C., Newburgh, NY (Daniel J. Schneider, Of Counsel), for Defendants County of Orange and Orange County Human Rights Commission.

Epstein Becker & Green, P.C., New York, NY (Peter D. Stergios, Clare M. Sproule, Of Counsel), for Defendants Hubert Lee, Carol Chichester, Mary Simmons, Graham Skea, Fran Turi and Christopher Sherwood.

## OPINION AND ORDER

CONNER, Senior District Judge.

Plaintiff Ian Berkowitz, a Caucasian Jewish male, brings this action against the County of Orange, the Orange County Human Rights Commission ("OCHRC"), ex-Commissioners Hubert Lee, Angela Colonna and Carol Chichester, and present Commissioners Mary Simmons, Graham Skea, Fran Turi and Christopher Sherwood (collectively, the "Commissioners" or "Commissioner defendants"), alleging racial/religious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New York State Human Rights Law, N.Y. EXEC. LAW § 290

*et seq.* ("NYHRL").[1] The OCHRC and the Commissioner defendants bring this motion for summary judgment pursuant to FED. R. CIV. P. 56 dismissing all of plaintiff's remaining claims.

Plaintiff alleges that the Commissioners engaged in illegal reverse discrimination when they terminated him from his position as Executive Director ("ED") of the OCHRC. Specifically, plaintiff claims that the Commissioners: (1) desired to fill his position with a minority person before, during and after his hiring; (2) hired him nonetheless and ostensibly gave him positive performance reviews while secretly questioning his ability to fulfill his duties; (3) falsely claimed that he was terminated for violating his duties and as a result of his position's reduced workload; (4) in actuality terminated him because of his race and religion; and (5) actively sought to replace him with an African–American woman after his termination.

For the reasons that follow, defendants' motion for summary judgment is granted.

## BACKGROUND

In February 1997, plaintiff responded to a newspaper advertisement and submitted his resume and application for the position of ED in the OCHRC.[2] (Berkowitz Dep. at 7.)[3] Plaintiff had an initial interview in

---

1. Under two Joint Partial Stipulations of Dismissal entered into pursuant to FED. R. CIV P. 41(a), dated April 6, 2000 and July 6, 2000, respectively, plaintiff has voluntarily withdrawn his claims for: alleged defamation against defendants Lee and Colonna; alleged defamation, slander and libel against defendants County of Orange, County employees Carla Carlson and Theodore Catletti, and John and/or Jane Doe 1–10 (said names meant to designate employees of the County of Orange and Orange County Sheriff's Department, but none of whom have been identified); alleged invasion of privacy rights in violation of 42 U.S.C. § 1983 and alleged breach of implied duty of confidentiality and express duty of confidentiality against defendants County of Orange, Carlson, Catletti and John and/or Jane Does 1–10. All claims were

dismissed with prejudice and without costs to either party.

2. The OCHRC was founded in 1970 by a local law (Skea Dep. at 6) to foster mutual respect and understanding among all religious, racial and nationality groups, to investigate alleged violations of state human rights law, and to recommend educational programs to mediate disputes and promote diversity and racial tolerance. (Complt.¶ 8.)

3. All citations to "Berkowitz Dep." refer to the Multi–Page ™ transcript version of plaintiff's October 23, 1998, attached as Exhibit I to James Monroe's July 24, 2000 Affirmation in Opposition. Defendants have submitted portions of a different Berkowitz deposition (Sproule Affm., Ex. H), but since it is incomplete, undated and without context, the Court will cite exclusively to the above document.

either late February or early March, returned for a second interview in April (*id.* at 8–10), and was ultimately hired for the position in late June. (*Id.* at 16.) In the interim, plaintiff's application was reviewed, along with those of approximately six to eight other applicants, by the members of the OCHRC's Board of Commissioners. (Skea Dep. at 6–7; Chichester Dep. at 7–8.) Plaintiff scored highly on his interviews. (Chichester Dep. at 8.)

Plaintiff claims that Charlotte Johnson, an African–American female and Acting Commissioner at the time he was interviewed (Skea Dep. at 7–8; Chichester Dep. at 13), was among the other applicants. (Berkowitz Dep. at 66–67.) He states that Johnson was present for at least one of his first two interview meetings and asked him at least one question, though he does not recall its substance. (*Id.* at 11–12.) Plaintiff also claims that in Winter 1997, ex-Commissioners Richard Rivera[4] and Angela Colonna told him that Johnson wanted the position, but that the other Commissioners would not let her submit a resume. (*Id.* at 76.) Commissioner Graham Skea and ex-Commissioner Carol Chichester contend that Johnson was not a candidate, (Skea Dep. at 8; Chichester Dep. at 13), but the Commissioners did discuss, both during the hiring process and after plaintiff was hired, whether a person of color and/or a bilingual individual would be better suited for the position. (Chichester Dep. at 39–40; Colonna Dep. at 28–31.)

In early June 1997, plaintiff was informed that he was seriously being considered for the position, but that there was "conflict" among the Commissioners delaying the decision. (Berkowitz Dep. at 13–14.) Plaintiff claims that this "conflict" involved "heated discussions about whether or not a minority should be hired to fill

the position of executive director," and that both Rivera and Colonna told him this. (*Id.* at 74–75.) He also claims Colonna told him that, even though he was the most qualified applicant, some Commissioners still wanted to hire a minority person, and that "[Colonna] said she had to verbally tell the Commission that that was reverse discrimination and she would not stand for it." (*Id.* at 75.) Colonna does recall discussion on the minority hiring issue, and did voice objection to some of Skea's comments (Colonna Dep. at 31–33), but states that "[desiring to hire a minority] wasn't the reason behind ... [plaintiff's] termination." (*Id.* at 31.) Moreover, Colonna states that there were no discussions about hiring Johnson as ED prior to plaintiff's hiring. (*Id.* at 37.)

The Commissioners contend that their "conflict" was over whether to hire a new ED at all. Chichester testifies that based on the Barrett litigation[5] and questions about the actual workload the ED would handle, she did not think the OCHRC needed a new ED at that time. (Chichester Dep. at 10.) Moreover, she "absolutely [did] not" think plaintiff was the best qualified applicant for the position, and voiced her concerns to other Commissioners, but to no avail. (*Id.* at 29.) The workload issue was a matter of ongoing concern for the Commissioners at the hiring stage and throughout plaintiff's tenure as ED (*see* Skea Dep. at 25, 29–35; Chichester Dep. at 10–12; Colonna Dep. at 7–9; Turi Dep. at 17), and it played a major role in their decision to terminate him. (*See* Monroe Affm., Ex. E; Lee Dep. at 11.) Plaintiff's job offer was made in letter dated June 23, 1997 (Monroe Affm., Ex. B), he first reported to work July 7, 1997 (Berkowitz Dep. at 16–17), and Johnson resigned soon after plaintiff was hired. (*Id.* at 76.)

4. Rivera does not appear to have been deposed by either party in this action.

5. At the time plaintiff was interviewing, the OCHRC was involved in a lawsuit with the outgoing ED, Kevin Barrett. Although the parties' pleadings do not reveal the exact details of that suit, one stipulation provided that Barrett could re-obtain his position should he prevail. (Berkowitz Dep. at 14.)

Plaintiff received a printed job description which led him to understand that his job would entail "conducting investigations ... mediating complaints ... putting on presentations on cultural diversity, cultural awareness, sensitivity training ... doing outreach, managing the office and pretty much anything that fell within those different areas." (*Id.* at 17–18.) He states that he rarely had much contact with the other Commissioners and received no direction regarding his job duties, even at the monthly Commissioners' meetings. (*Id.* at 19–25.) Several Commissioners testify that they had little contact with plaintiff and few chances to observe him at work. (*See* Skea Dep. at 17–18; Chichester Dep. at 24; Sherwood Dep. at 33; Turi Dep. at 7.)

Plaintiff claims that nonetheless, during his first six months as ED, his work day was quite busy: "[I]f I wasn't investigating I was doing interviews; if I wasn't doing interviews I was putting together a diversity workshop. I mean there was always something to do." (*Id.* at 30–31; Sproule Affm., Ex. B.) Plaintiff gave one sensitivity training presentation to Emergency 911 system operators, attended one prejudice reduction training workshop and attended one investigators' training workshop in his first three months. (*Id.* at 22–24.) He can not recall how many complaints were filed in his office during this time. (*Id.* at 22.)

Plaintiff states that "the evaluations which the [sensitivity training] participants filled out, had all positive comments about my presentation." (Sproule Affm., Ex. B.) The Commissioners contend that the attendees were dissatisfied with plaintiff's performance. Skea notes that plaintiff "apparently tried to condense a day's—day and a half's training into a three-hour program ... the participants were very unhappy with the method of presentation." (Skea Dep. at 12.) Chichester states that plaintiff's alteration of the training method was "ill advised" and that the seminar "did not go over too well." (Chichester Dep. at

26.) In addition, the Commissioners claim that they were growing increasingly more uncomfortable with plaintiff's general communication style. Skea testifies that "[plaintiff's] statements came off ... in an abrasive ... loud manner." (Skea Dep. at 20; *see also* Chichester Dep. at 24–25; Colonna Dep. at 14.)

Plaintiff states that although his job description remained unchanged after his first three months, his actual duties consisted of little more than performing investigations. (Berkowitz. Dep. at 26–27.) Plaintiff also claims that one of the ex-Commissioners Lee, Chichester or Colonna "specifically told" him no longer to perform either presentations or community outreach by this point. (*Id.* at 27.) Colonna remembers discussing outreach programs with plaintiff, but does not recall why they were not implemented. (Colonna Dep. at 13.) Plaintiff also states that in October 1997, he was invited to participate in a panel discussion on discrimination in his capacity as ED, but that Colonna told him the Commissioners would rather have Mary Simmons, an African–American female Commissioner, participate instead of him. (Berkowitz Dep. at 79–81.) He claims that no explanation was provided for the replacement. (*Id.* at 81.) Colonna does not mention or corroborate this conversation anywhere in her deposition testimony.

Plaintiff notes that soon after his hiring, Rivera told him he would receive "periodic evaluations approximately every three months" regarding his job performance (*id.* at 33–34), but he did not receive his first formal evaluation until January 6, 1998. (Monroe Affm., Ex. C.) On this evaluation, plaintiff received an overall score of twenty-nine points out of a possible forty-five, for an average "4.5" score out of a possible "9." (*Id.*) He received a "5" (out of 9) for "Job Knowledge," a "6" for both "Quality" and "Quantity" of work, and a "5" for "Work Habits." (*Id.*) His lowest mark, a "3," was for "Communication Skills," and contained the written re-

marks: "Ian would benefit from additional training in oral delivery & should minimize body language (waving arms & hands) during presentations. When speaking to potential clients, words like 'buddy' should not be used." (*Id.*) Plaintiff also received a "4" for "Interpersonal Relationships," with the written remarks: "Suggest use of an evaluation tool for all public presentations as feedback will be the best indicator of communication skills." (*Id.*)

Finally, in the "Comments" column, the remarks state: "Ian's strengths are his organizational skills, positive attitude and level of motivation. It would be advantageous to the position if a softer approach were made while communicating to the diverse population calling & coming into the human rights office." (*Id.*) Chichester testifies that she wrote all the remarks based on information provided to her from Colonna. (Chichester Dep. at 21, 24; *see also* Colonna Dep. at 14.) She states that in her opinion, plaintiff's monthly reports were "very well organized." (Chichester Dep. at 22.) Moreover, she notes that his "attitude" and "motivation level" were positive attributes that a good ED would want to have. (*Id.* at 22–23.) She suggested the "softer approach" because she felt plaintiff's perceived aggressive or abrasive mannerisms would not endear him to potential complainants coming into his office. (*Id.* at 23–24.)

Dissatisfied with his scores, plaintiff claims that he confronted Chichester about his evaluation and that she told him the evaluation was good because no one receives scores of 9 or 10. (Berkowitz Dep. at 35.) Chichester's testimony does not mention this conversation. Plaintiff then submitted a memorandum in response to his evaluation dated January 13, 1998. (Sproule Affm., Ex. B.) In it, he expressed dissatisfaction with "[hav]ing not received any type of feedback from the members of the Commission or clients about the manner in which I communicate," explained his hand gestures as involuntary, and defended his professional conduct when dealing with clients. (*Id.*) Plaintiff's memorandum apparently did not produce the desired effect, for he received a reply memorandum from Chichester dated March 17, 1998, ignoring his comments and noting an incident where plaintiff violated the OCHRC's directives and policy regarding investigations. (Sproule Affm., Ex. C.)

In late September 1997, Orange County attorney Rick Golden entered into a Memorandum of Understanding ("MOU") with the OCHRC whereby all complaints would be forwarded to the New York State Human Rights Commission ("NYSHRC"). (Chichester Dep. at 25; Colonna Dep. at 15.) The Commissioners viewed this MOU as signaling a decreased workload for the ED position, which lessened the need for its existence in their minds. (Skea Dep. at 25; Chichester Dep. at 34.) Plaintiff contends that the MOU did not lessen the number of cases he handled, but rather categorized them differently as NYSHRC complaints. (Berkowitz Dep. at 39–40.) The Commissioners felt that plaintiff was "nearly argumentative" with Golden over the MOU (Chichester Dep. at 25), and Colonna states that she had to publicly reprimand him when he would not relent. (Colonna Dep. at 15.) The Commissioners were concerned that plaintiff would not adhere to the limitation on his investigatory powers (*id.* at 15–16), which he admittedly did not. (Berkowitz Dep. at 47.)

Plaintiff explains that the incident noted in the March 17 memo concerned a female public school bus driver claiming wrongful termination. (*Id.* at 43–44.) Plaintiff contacted the Regional Director of the New York State Division of Human Rights, who instructed him to contact the bus company and determine why the woman had been fired. (*Id.* at 44.) Plaintiff claims that he told the Regional Director such action would overstep his powers based on the MOU, but that the Director assured him he was within his boundaries because Plaintiff's actions would only amount to an "inquiry" instead of an "investigation." (*Id.* at 46–47.) Although unsure whether

he could act or not, plaintiff testifies that "in my professional mind-set I was not investigating" (*id.* at 47), and that he made a "business decision," contacted the bus company, resolved the problem, and returned the woman to work. (*Id.* at 44–45.)

Plaintiff states that he immediately informed Chichester of the situation, who instructed him to recount the events to the full Commission at the following meeting, which he claims he did. (*Id.* at 45–46.) Plaintiff further claims that although the incident occurred sometime in October 1997, it was never mentioned to him, and only surfaced in the Commissioners' March 2, 1998 memorandum. (*Id.* at 46.) However, Colonna testifies that she confronted plaintiff about the incident at a Fall 1997 monthly meeting. (Colonna Dep. at 15–16.) Chichester adds that plaintiff "almost [apologized] for having done something that he was asked not to do (*i.e.*, investigate). But he thought it was handled well." (Chichester Dep. at 34.) She states that by this time—late October 1997 and barely three months into plaintiff's tenure as ED—the Commissioners began discussing his termination. (*See id.* at 27.)

Plaintiff claims that shortly after this incident, Rivera, who had recently stepped down from the OCHRC, contacted him to discuss his standing with the Commissioners. (Berkowitz Dep. at 49–50.) Plaintiff claims Rivera told him that some Commissioners felt that he was "too forceful" in his investigations, but that this opinion was based in part on "politics," and in part on plaintiff's military background. (*Id.* at 50–52; *see also* Chichester Dep. at 10.) Plaintiff testifies that this conversation led him to believe that his evaluation had been discussed with a non-commissioner (i.e., Rivera), in violation of his privacy. (Berkowitz Dep. at 52.) Plaintiff claims he then confronted Chichester with his suspicions, and states that she told him Colonna must have discussed the evaluation with Rivera, "because [they were] friends." (*Id.* at 52–53.) Plaintiff then met with Rivera and Colonna (*see* Colonna Dep. at 18), and claims that he resolved all matters by sending memoranda to Chichester and Linda Cusato, a Personnel Department employee, "apologiz[ing] if [he] caused any problems." (Berkowitz Dep. at 54–55.) Chichester's testimony confirms plaintiff's actions, but does not exonerate him, as he suggests. (*See* Chichester Dep. at 34.)

Plaintiff claims that on March 6, 1998, he met with Lee at his home told him that he felt he was "being railroaded" because of his evaluation and because he was never given any feedback on his job performance. (Berkowitz Dep. at 56.) He claims Lee blamed the Commissioners' actions on their distraction with the Barrett lawsuit, but that Lee told him "I know some Commissioners don't want you, other Commissioners want you." (*Id.* at 57; *see also* Chichester Dep. at 29; Colonna Dep. at 19.) Plaintiff states that Lee assured him his job was secure and told him that some Commissioners were considering resigning, and that after that occurred and the Barrett lawsuit concluded, things would change; plaintiff states that he believed Lee. (Berkowitz Dep. at 58.) Lee's testimony does not mention this meeting, but Colonna does recall that plaintiff visited Lee's home at some time. (*See* Colonna Dep. at 18.)

At this point, the Commissioners had all but decided to terminate plaintiff. There is dispute over whether the Commissioners voted at both the April and June executive meetings. A vote was clearly taken at the April 8, 1998 meeting. (*See* Berkowitz Dep. at 86; Monroe Affm., Ex. H; Chichester Dep. at 31.) Other testimony suggests that a vote was also taken at the June meeting. (*See* Colonna Dep. at 34–35; Taylor Dep. at 52–53.) Both votes were unanimous among those voting (Skea Dep. at 46; Chichester Dep. at 34–35); Lee and Colonna abstained because of their displeasure at having been individually named in the Barrett litigation. (Lee Dep. at 11–13; Colonna Dep. at 35.)

The formal letter terminating plaintiff was presented at the June 1998 meeting. It offers the following reasons for the decision: "The Commission lacks confidence in your ability to fulfill the variety of responsibilities necessary within this position of Executive Director. This, together with the marginal workload of complaints brought before the Commission, has resulted in the Commission's decision." (Monroe Affm., Ex. E.) The letter is signed by ex-Commissioner Chichester, Commissioners Skea, Turi, Peg Jeffries, Simmons and Sherwood, the names of the last three being signed by Chichester on their authorization by telephone. These names were all the acting Commissioners as of June 12, 1998 (*see* Calderin Dep. at 27), except for Lee and Colonna. Lee did not sign due to his abstention (*see* Taylor Dep. at 52–53), and Colonna testifies that she was never asked to sign the letter and had not seen it before it was shown to her at her May 16, 2000 deposition (Colonna Dep. at 26–27); she also did not attend the executive portion of the June 1998 meeting. (*See* Calderin Dep. at 16; Taylor Dep. at 34.)

Present Commissioners Denay Taylor and Robert Calderin did not participate in the decision to terminate plaintiff, although they both inquired about the reasons for his termination. (Taylor Dep. at 35–36; Calderin Dep. at 20.) Taylor states that they were not allowed to participate because they were newly-appointed Commissioners at that time, and thus were not privy to the events leading up to the decision to terminate plaintiff. (Taylor Dep. at 59.) In addition, Skea claims that the decision to terminate plaintiff had been made prior to the June 1998 executive meeting (Skea Dep. at 55), and Calderin confirms this. (Calderin Dep. at 12.) The first meeting attended by Taylor was in May 1998 (Taylor Dep. at 18), and the first attended by Calderin was in June 1998. (Calderin Dep. at 29.)

Taylor testifies that at the June. meeting, Skea "stated that [the OCHRC] need[s] someone different to bring diversity—to bring more diversity together in the County and to promote—to promote better diversity in the County. . . . He did call a name of Charlotte Johnson. . . . [He] mentioned that Charlotte Johnson was a very good candidate for the position." (Taylor Dep. at 28–29, 41.) Taylor continues: "Skea . . . stated that [plaintiff] was inappropriate. When we asked why he was inappropriate [Skea] said . . . 'I feel . . . the position would be better filled with someone who was African American. . . .' [He] stated that he felt that an African-American woman such as Charlotte Johnson . . . would be better fitted for the position." (*Id.* at 33, 42.) Taylor states that she did not agree with Skea's remarks and that Calderin felt as she did, claiming that they "challenged" Skea's opinions. (*Id.* at 44–45.) Calderin testifies that he does not recall Skea making any such statements, and he makes no mention of challenging Skea. (Calderin Dep. at 36–37.) However, he states he "would have criticized those comments very energetically" had he heard them. (*Id.* at 18.)

Skea testifies that at this June meeting he said "that perhaps [the OCHRC] would have been better served if a female minority were considered [for the ED position]." (Skea Dep. at 53.) He explains that he "believe[d] that perceptional [sic] for a minority that had a concern or a complaint that they would be more comfortable going before another minority rather than a white director. That would be the perception." (*Id.*) He also denies speaking directly to Taylor about the issue (*id.* at 52), says that Charlotte Johnson was not mentioned "at all" (*id.* at 54), states that no other commissioner made any similar statements (*id.* at 57), and claims that his statements were made after the decision to terminate plaintiff. (*Id.* at 58.) However, Chichester states that the conversations about the ideal ED had been "ongoing" among the Commissioners, and that Skea had been making these statements since before plaintiff was hired. (Chichester

Dep. at 39–40; *see also* Colonna Dep. at 29–30.) Colonna also observed that Skea had a model ED in mind "from day one." (Colonna Dep. at 30.)

Plaintiff alleges that one day prior to his termination he spoke to Taylor and that she asked him to send her a copy of his performance evaluation, whether he had had any arguments with any Commissioners, or specifically with Skea, and what, if anything, he knew about Charlotte Johnson. (Berkowitz Dep. at 65–66.) Plaintiff also claims that Taylor recounted Skea's alleged comments to him. (*Id.* at 67.) Although Taylor says that plaintiff contacted her on June 12, 1998, the evening of his termination (Taylor Dep. at 61), her testimony otherwise confirms most of his statements. (*See id.* at 62–64.)

On Friday, June 12, 1998, Chichester and Skea entered plaintiff's office and handed him his termination letter. (Berkowitz Dep. at 63; Chichester Dep. at 36–37; Skea Dep. at 45–46.) Plaintiff told them that he anticipated his firing because one of the Commissioners (Taylor) had already warned him. (Berkowitz Dep. at 64; Chichester Dep. at 37.) Although he does not recall exactly what he said to Skea (Berkowitz Dep. at 70), plaintiff claims that he accused him of making the "intelligent black female" comments that Taylor mentioned (*see id.* at 67, 73), and that Skea admittedly replied, "you're right, I did say those things." (*Id.* at 64.) Skea does not confirm this in his testimony, but notes that plaintiff "seemed highly upset and spoke in a threatening tone" upon receiving his termination letter. (Skea Dep. at 45–46; *see also* Chichester Dep. at 36–37.) Plaintiff states he then called Lee and told him he had been fired, and claims Lee said "I don't know nothing [*sic*] about it." (Berkowitz Dep. at 65.) Lee's testimony makes no mention of this phone call.

Plaintiff points to two documents that the OCHRC drafted as evidence of a search to find his replacement as ED. The first is a memorandum dated June 15, 1998 from Chichester to the other Commission-

ers. (Monroe Affm., Ex. H.) It recounts the events of June 12, 1998 surrounding plaintiff's termination, discusses the resulting administrative tasks Chichester had to take on, and states: "A letter (copy attached) has been sent to the county Personnel Department regarding the Commission's continued discussion on the need for a full time [ED] within the Human Rights office." (*Id.*) The second is a July 2, 1998 memorandum from Chichester to Linda Cusato in the Personnel Department. (Monroe Affm., Ex. G.) It states, in relevant parts: "The Commission is seeking your expertise regarding the need for a full time position within the Human Rights Commission Department. Could you please assist us with this evaluation? .... We have also discussed re-looking at the [ED] job description and need to know what the process would be for making any changes to same." (*Id.*) Colonna testifies that this request was a procedural formality, for "in order to [change the ED job description] you would have to go to the Personnel Department and it would be an entire revamping of job descriptions." (Colonna Dep. at 9.)

A number of Commissioners testified that at no time after plaintiff's termination did they discuss hiring or actively recruiting another ED. (*See* Lee Dep. at 13–14; Skea Dep. at 54; Chichester Dep. at 43; Sherwood Dep. at 25; Turi Dep. at 18–19; Simmons Dep. at 15; Taylor Dep. at 65; Calderin Dep. at 23.) Moreover, no one was ever hired to replace plaintiff, and the ED position was eliminated shortly after his termination. (Sherwood Dep. at 25; Turi Dep. at 18–19.) Plaintiff also admits that other than Taylor's account of Skea's alleged statements, he has no factual basis to believe the Commissioners were trying to replace him with a black female, and no information that they made any search efforts to replace him. (Berkowitz Dep. at 73.)

Plaintiff testifies that he has no proof the OCHRC believed that a black female was more appropriate for his position than

a white Jewish male "other than [Skea's alleged] statement and the fact that there was no justifiable reason for me to be terminated" (*id.* at 74.), and that he bases his allegations that "other" OCHRC Commissioners wanted to hire a minority on his Winter 1998 conversations with Rivera and Colonna, as well as his June 1998 conversation with Taylor. (*Id.* at 77–78.) Taylor testifies that Skea once stated that "It would be more beneficial for an African American to be in [the ED] position than a Jewish person to be in this position" (Taylor Dep. at 72), but she provides no context for the statement. She also testifies that Sherwood told ethnic Jewish jokes and made "inferences" about plaintiff, but she can not recall the specific jokes and plaintiff was not specifically named. (*Id.* at 74–75.) She does state that while she did not find the jokes "offensive," she did find them "interesting," especially because she is part Jewish. (*Id.* at 90–91.) Calderin testifies that at the June 1998 meeting, neither plaintiff's religion nor race were discussed. (Calderin Dep. at 17–18.) Plaintiff also testifies that regarding general "anti-white animus," "I don't know what the Commissioners believe or think but nothing was ever directed at me." (Berkowitz Dep. at 79.)

## DISCUSSION

### I. *Summary Judgment Standard*

The Commissioner defendants move for summary judgment pursuant to FED. R. CIV. P. 56. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 254

(E.D.N.Y.1999). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali,* 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir.1991).

In employment discrimination cases, the Second Circuit has stressed that " '[a] trial court must be cautious about granting summary judgment to an employer where ... intent is at issue.' " *Cunliffe v. Sikorsky Aircraft Corp.,* 9 F.Supp.2d 125, 129 (D.Conn.1998) (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994)). Nonetheless, the Circuit "has also explained that 'summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact.' " *Id.* (quoting *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 40 (2d Cir.1994)). Thus, " 'a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.' " *Ticali,* 41 F.Supp.2d at 254 (quoting *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997)).

### II. *Shifting Burdens of Proof*

In discriminatory discharge actions brought pursuant to Title VII, courts traditionally follow the three-step burden shifting procedure set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 505–12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). These standards ap-

ply equally to federal and New York State law claims, and especially to those brought under Title VII and the NYHRL. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997). Thus, this Court's holding with respect to plaintiff's Title VII claim applies equally to his NYHRL claim.

■ In this procedure, the aggrieved employee bears the burden of establishing a prima facie case of unlawful discrimination, proving by a preponderance of the evidence: (1) membership in a protected class; (2) satisfactory performance of job duties; (3) discharge from the job; and (4) discharge occurring in circumstances giving rise to an inference of discrimination. *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817; *Cunliffe,* 9 F.Supp.2d at 130. Also, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden of going forward shifts to the employer to articulate some legitimate, non-discriminatory reason for its action. *See St. Mary's Honor Ctr.,* 509 U.S. at 506–07, 113 S.Ct. 2742. If the employer does so, the presumption of discrimination "simply drops out of the picture," *id.* at 510–11, 113 S.Ct. 2742, and the employee "must show that the defendant's non-discriminatory reason is a pretext for unlawful discrimination." *Ticali,* 41 F.Supp.2d at 260.

## III. *"Reverse Discrimination" Standards*

■ As a white male, plaintiff is not a member of a protected class under Title VII. *See, e.g., id.; Cunliffe,* 9 F.Supp.2d at 130. Nonetheless, plaintiff urges the Court to adopt the reasoning in a line of cases that permit non-minority plaintiffs to

make out a prima facie Title VII case by showing that "defendant is that 'unusual employer who discriminates against the majority.'" (Pl. Mem. Opp. Summ. J. at 8) (citing *Olenick v. New York Tel.,* 881 F.Supp. 113, 114 (S.D.N.Y.1995) (quoting *Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981))); *Umansky v. Masterpiece Int'l Ltd.,* No. 93 Civ. 2367, 1998 WL 433779, at *3 n. 3 (S.D.N.Y. July 31, 1998) (applying *Olenick* ).

There is considerable authority for not employing such altered analysis. *See, e.g., Ticali,* 41 F.Supp.2d at 261 (rejecting *Olenick,* noting that the "Second Circuit has not yet resolved this issue," and adopting the rationale of *Cully v. Milliman & Robertson, Inc.,* 20 F.Supp.2d 636, 641 (S.D.N.Y.1998), which held that "absent binding authority to the contrary, this court must assume that *McDonald* [*v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 279, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)] means what it says: a Title VII case is a Title VII case on the 'same terms' for plaintiffs of all races."); *Cunliffe,* 9 F.Supp.2d at 129 n. 3 (rejecting *Olenick* ). This Court will follow *Ticali* and apply *McDonald* evenly to the facts at hand. In other words, the Court will assume that white persons, as a class, are protected from discrimination against that class. Thus, for the purposes of this summary judgment motion, plaintiff is deemed to have met *McDonnell Douglas's* first requirement.

## IV. *Plaintiff's Showing*

### A. *Satisfactory Performance*

■ Plaintiff must next show that he performed his job satisfactorily. The Commissioners felt he had a "loud and abrasive" manner when communicating with them and clients. (Skea Dep. at 20; *see also* Chichester Dep. at 24–25; Colonna Dep. at 14.) In addition, at the only training seminar plaintiff conducted, the Commissioners report that "the participants were very unhappy" (Skea Dep. at

12) and that it "did not go over too well." (Chichester Dep. at 26.) Furthermore, plaintiff admitted that he violated OCHRC policy by conducting an unauthorized investigation. (Berkowitz Dep. at 47.) Based on all these events, the Commissioners began discussing plaintiff's termination after only three months on the job, (*see* Chichester Dep. at 27), and put it to a Commission vote after only six months. (*See* Berkowitz Dep. at 86; Monroe Affm., Ex. H; Chichester Dep. at 31.)

On the other hand, plaintiff's evaluation form notes his "strong organizational skills, positive attitude, and level of motivation," and he received an overall score of "4.5" out of a possible "9." (Monroe Affm., Ex. C.) He also received a "5" for "Job Knowledge," a "6" for both "Quality" and "Quantity" of work, and a "5" for "Work Habits." (*Id.*) Chichester's own written remarks state: "Ian's strengths are his organizational skills, positive attitude and level of motivation." (Chichester Dep. at 22.) She also stated that in her opinion plaintiff's monthly reports were "very well organized." (*Id.*) Moreover, she notes that his "attitude" and "motivation level" were positive attributes that a good ED would want to have. (*Id.* at 22–23.) Though far from a glowing review, it is not predominantly negative.

Plaintiff may have been overbearing and too forceful in his approach. However, he received almost no feedback, either positive or negative, before he was formally evaluated (Berkowitz Dep. at 56; *see also* Chichester Dep. at 24.) Several Commissioners testify that they had little contact with plaintiff and few chances to observe him at work. (*See* Skea Dep. at 17–18; Sherwood Dep. at 33–34; Turi Dep. at 7.) Furthermore, in light of the MOU removing plaintiff's investigatory powers, as well as the Commissioners' refusal to allow him to attend the panel discussion in his ED capacity (*see* Berkowitz Dep. at 79–81), it is doubtful that plaintiff had the proper opportunity to adequately perform his stated job duties. Thus, the court finds

that, at the least, there is a triable issue as to whether plaintiff performed his job satisfactorily, meeting the second *McDonnell Douglas* requirement.

Since it is undisputed that plaintiff was terminated on June 12, 1998, he has also satisfied the third *McDonnell Douglas* requirement.

### B. *Discriminatory Discharge*

Plaintiff's prima facie case therefore turns on whether he can meet *McDonnell Douglas's* fourth requirement of showing that he was discharged under circumstances giving rise to an inference of discrimination. In the present unusual circumstances in which plaintiff's position was discontinued after his firing, this Court must determine whether he can make out his prima facie case without showing that his employers attempted to fill his position with a member of a protected class.

Plaintiff cites two cases in support of this proposition, *Meiri v. Dacon*, 759 F.2d 989 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), and *Umansky*, 1998 WL 433779. (Pl. Mem. Opp. Summ. J. at 12.) *Meiri* states that forcing a Title VII plaintiff to prove that he was "replaced by a person outside the protected class ... is inappropriate and at odds with the policies underlying Title VII." 759 F.2d at 996. Instead, the court held that "the appropriate inquiry should be whether the employer continued to seek applicants to fill the position.... The fact that the position was eliminated is of little relevance and should not sound a death knell to [plaintiff's] Title VII claim." *Id.* However, the court conceded that failing to show that a Title VII plaintiff's position was filled does "weaken" the plaintiff's case. *Id.*

Recent decisions acknowledge *Meiri* and its progeny, stating that "the Second Circuit has rejected the per se rule followed in certain other circuits that a plaintiff in a discrimination case must demonstrate that

she was replaced by a person outside the protected class." *Umansky,* 1998 WL 433779, at *3; *see also Ticali,* 41 F.Supp.2d at 262. However, both of these cases decline to follow *Meiri* and instead side with *Estepa v. Shad,* 652 F.Supp. 567 (E.D.N.Y.1987), which strongly calls into doubt *Meiri's* reasoning, stating that "absent other facts from which inferences may be drawn, unless a Title VII plaintiff is replaced by a member of a non-protected class, proof of intentional discrimination appears extremely difficult, if not practically impossible." *Estepa,* 652 F.Supp. at 571 n. 5. Thus, this Court is puzzled why plaintiff cites *Umansky,* a case that strongly opposes plaintiff's position.

■ Moreover, *Meiri* is distinguishable from the instant case because the defendant employer in *Meiri* "searched for a suitable replacement for [plaintiff's job] ... for approximately one year." 759 F.2d at 993 n. 3. Here, plaintiff can point to only two documents that at best suggest, but do not approach proving, that Commissioner defendants actively sought a replacement for plaintiff. The first, a memorandum dated June 15, 1998 from Chichester to the other Commissioners, reads, in relevant part, "A letter ... has been sent to the county Personnel Department regarding the Commission's continued discussion on the need for a full time [ED] within the Human Rights office." (Monroe Affm., Ex. H.) At most this document proves that the Commissioners considered the possibility of replacing plaintiff. However, they had similar discussions before even interviewing plaintiff, and only hired him after much debate. (*See* Chichester Dep. at 29.) In fact, it was doubtful whether the position would be continued following the Barrett tenure. (*See id.*)

The second document, a July 2, 1998 memorandum from Chichester to Linda Cusato in the Personnel Department, states, in relevant parts: "The Commission is seeking your expertise regarding the need for a full time position within the Human Rights Commission Department.

Could you please assist us with this evaluation? .... We have also discussed re-looking at the [ED] job description and need to know what the process would be for making any changes to same." (Monroe Affm., Ex. G.) This request was merely a procedural formality the Commissioners had to pursue in case they decided to fill the ED position. Colonna testifies that "in order to [change the ED job description] you would have to go to the Personnel Department and it would be an entire revamping of job descriptions." (Colonna Dep. at 9.) It is highly unlikely that, faced with two disappointing ED tenures, a workload so light that it was questionable whether the position should be continued (*see* Skea Dep. at 25, 29–35; Chichester Dep. at 10–12; Colonna Dep. at 7–8; Turi Dep. at 17), and litigation brought against them by an ex-ED, the Commissioners would rush out to hire an new ED.

Furthermore, plaintiff has offered no evidence to rebut the overwhelming testimony that shows that no Commissioner actively sought, or even raised the issue of seeking, a replacement ED for plaintiff. (*See* Lee Dep. at 13–14; Skea Dep. at 54; Chichester Dep. at 43; Sherwood Dep. at 25; Turi Dep. at 18–19; Simmons Dep. at 15; Taylor Dep. at 65; Calderin Dep. at 23.) Plaintiff himself admits that he has no such information. (*See* Berkowitz Dep. at 73.) Moreover, the position was eliminated shortly after plaintiff was terminated (*see* Sherwood Dep. at 25; Turi Dep. at 18–19) and has not been reinstated for over two years. In light of the strong precedent requiring a white Title VII plaintiff claiming discriminatory discharge to prove that his employer actually filled or at least tried to fill his position with a non-white person, and even viewing the proffered evidence in a light most favorable to him, this Court finds that plaintiff has failed to show that his termination came under circumstances giving rise to an inference of discrimination. He has therefore to make out a prima facie case of unlawful discrimination.

## 400

### V. *"Mixed Motives"*

 Plaintiff argues in the alternative that he has made out a prima facie case under the "mixed-motives" burden shifting analysis set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). (Pl. Mem. Opp. Summ. J. at 13.) To do so, he "must initially show that an impermissible criterion was in fact a *motivating or substantial* factor in the employment decision." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997) (citing *De La Cruz v. New York Human Resources Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir.1996).) If plaintiff proves this, "the burden shifts *to* the employer to prove by a preponderance of the evidence that it would have made the same decision [anyway]." *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775; *see also Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 180 (2d Cir.1992).

 This argument for a mixed-motives approach is of no avail to plaintiff on the instant motion for summary judgment because it concerns only the shifting of the burden of proof to the defendant *after* the plaintiff has made out a prima facie case of discrimination. It never comes into play if the plaintiff fails to produce evidence creating an inference of discrimination. Thus, in the present case, plaintiff fails on the mixed-motives analysis for the precise reason he failed on the *McDonnell Douglas* analysis. Indeed, plaintiff's burden of establishing a prima facie case is even greater under the mixed-motives approach than under *McDonnell Douglas*.

 Plaintiff concedes · that in mixed-motives analysis, he faces a "very heavy burden." (Pl. Mem. Opp. Summ. J. at 13.) This· is so because "plaintiff must show that the evidence is sufficient to allow a fact finder to infer both permissible and discriminatory motives ... [thus] the plaintiff's initial burden in a *Price Waterhouse* mixed-motive case is heavier than the de minimis showing required to establish a prima facie *McDonnell Douglas*

case." *Raskin*, 125 F.3d at 60. The *Raskin* court emphasizes plaintiff's plight: "In short, to warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Id.* at 60–61 (citing *Fields v. New York State Office of Mental Retardation and Devl. Disabilities*, 115 F.3d 116, 124 (2d Cir.1997)).

 Plaintiff offers Taylor's account of what Skea allegedly said at the June 1998 meeting as his "smoking gun." (Pl. Mem. Opp. Summ. J. at 14.) But Taylor's testimony is not the "smoking gun" plaintiff needs to make out a prima facie case. Even if her account of Skea's statement is accurate, it represents the view of only one Commissioner, while a number of other Commissioners expressed strong views to the contrary. (*See* Colonna Dep. at 31–33; Taylor Dep. at 44–45.) It thus can not be considered a "substantial or motivating factor" in the Commissioners' decision to terminate plaintiff. Obviously, Skea's reported view did not prevail because plaintiff, a white man, was hired for the position. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997) ("when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.").

 In an alternative effort to make out his prima facie case under a mixed-· motives theory, plaintiff claims that the Commissioners discharged him because of his Jewish religion. (Pl. Mem. Opp. Summ. J. at 14–15). Plaintiff again offers Taylor's testimony as proof of the Commissioners' discriminatory animus. She claims that Skea once stated that "it would be more beneficial for an African American to be in [the ED] position than a Jewish person to be in this position" (Taylor Dep. at 72), but she provides no context for the statement. (*Id.* at 74–75.) She also testifies that Sherwood told ethnic Jewish jokes and made "inferences" about plain-

tiff, but she can not recall the specific jokes and plaintiff was not specifically named. She does state that while she did not find the jokes "offensive," she did find them "interesting," especially because she is part Jewish. (*Id.* at 90–91.) Calderin testifies that at the June 1998 meeting, neither plaintiff's religion nor race were discussed. (Calderin Dep. at 17–18.)

Plaintiff admits, though, that he has no proof the OCHRC believed that a black female was more appropriate for his position than a white Jewish male "other than [Skea's alleged] statement and the fact that there was no justifiable reason for me to be terminated." (Berkowitz Dep. at 74.) Plaintiff also testifies that regarding general "anti-white animus," "I don't know what the Commissioners believe or think but nothing was ever directed at me." (*Id.* at 79.) The Court finds that the lack of substantiation of Taylor's claims and plaintiff's own admissions defeat his effort to create an inference that the Commissioners terminated him based on his Jewish religion.

█ Finally, even assuming *arguendo* that Taylor's testimony was sufficient to make out plaintiff's prima facie case, the Commissioners have provided ample evidence that they would have fired plaintiff without any consideration of his race, gender or religion. The undisputed evidence clearly shows that, after Barrett left, the Commissioners did not think another ED was needed. (*See* Chichester Dep. at 10.) Indeed, the workload issue had been a matter of ongoing concern for the Commissioners at the hiring stage and throughout plaintiff's tenure as ED. (*See* Skea Dep. at 25, 29–35; Chichester Dep. at 10–12; Colonna Dep. at 7–8; Turi Dep. at 17.) The undisputed fact that the position was discontinued after plaintiff's termination and has never been reinstated in the two years and four months since, conclusively shows that the motivating cause of his termination was the Commission's feeling that the position was no longer a justifiable expenditure of public funds.

(*See* Sproule Affm., Ex. D; Lee Dep. at 11.) The Court therefore finds that the Commissioners would have fired plaintiff without any influence of his race, gender or religion. Thus, plaintiff can not succeed under the *Price Waterhouse* mixed-motives analysis.

## CONCLUSION

For the foregoing reasons, the OCHRC's and Commissioner defendants' motion for summary judgment is granted, and the action is dismissed in its entirety, with prejudice. The Clerk of the Court shall enter judgment for OCHRC and Commissioner defendants.

SO ORDERED.