Gregory **LAMBERSON**, Plaintiff,

v.

**SIX WEST RETAIL ACQUISITION, INC., Solow Management Corp., Solow Realty & Development Company, LLC, The Paris Theater Company, LLC, Jacobs Entertainment, Inc., Sheldon Solow, and Jeffrey Jacobs, Defendants.**

**No. 98 Civ. 8053 DC.**

United States District Court, S.D. New York.

Dec. 7, 2000.

Law Offices of Jonathan Weinberger by Jonathan Weinberger, New York City, for plaintiff.

Dreier & Baritz LLP by Marc S. Dreier, New York City, for defendants.

## OPINION

CHIN, District Judge.

Plaintiff Gregory Lamberson, a Caucasian male, alleges that he was unlawfully discharged from his job as manager of a movie theater because he complained when his employer reassigned an African–American employee from the publicly visible position of ticket-taker to the behind-the-scenes position of usher. Lamberson asserts claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and New York law for discrimination on the basis of race and retaliation.

Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56, arguing that Lamberson was dismissed not for any unlawful reason but because he exercised poor judgment in exercising his managerial duties. For the following reasons, de-fendants' motion is granted in part and denied in part.

## BACKGROUND

### A. The Facts

Construed in the light most favorable to plaintiff, the facts are as follows:

#### 1. Defendants

Defendant Six West Retail Acquisition Inc. ("Six West") operates the Paris Theater (the "Paris"), a movie theater located on West 58th Street in New York City that exhibits primarily independent and art films. (Declaration of Steven Cherniak, ¶ 2). Six West is wholly owned by Sheldon Solow. (Id.). At all relevant times, Six West engaged Jacobs Entertainment, Inc. ("Jacobs Entertainment") as the managing director of the Paris. Pursuant to this arrangement, Jacobs Entertainment's principal, Jeffery Jacobs, oversaw the operation of the Paris. (Cherniak Decl. ¶ 5).

It is undisputed that defendants Solow Management Corporation and Solow Realty & Development Company, LLC, have "no role in the ownership or operation of the Paris," and that The Paris Theat[re] Company is a dormant entity that was formed for the purpose of operating the Paris but has never been used for that or any other purpose. (Cherniak Decl. ¶¶ 1, 3–4; Def. 56.1 ¶¶ 1–6; Pl. 56 .1; see Local Civil Rule 56.1(c)).

#### 2. Lamberson's Employment at the Paris

On June 23, 1997, Six West, through Jacobs, hired Lamberson to be the manager of the Paris. (Compl ¶ 17; Ans. ¶ 17; Cherniak Decl. ¶ 6). Over the course of his employment, Lamberson frequently complained to Jacobs, his immediate supervisor, about a variety of topics, including (but by no means limited to): inadequate staffing; inadequate security; the inadequate porter's union selected by Solow; the Paris's lack of affiliation with

"777–FILM"; and Lamberson's lack of authority over payroll matters. (Def. 56.1 Exs. 12, 16–24, 26–27, 29, 30, 32–33). Despite the barrage of complaints, it appears that Jacobs thought Lamberson performed his job well. Indeed, on May 27, 1998, Jacobs sent a letter to Steven Cherniak, Chief Executive Officer of Six West, praising Lamberson and requesting that he be given a $100 per week raise. (Pl. 56.1 Ex. 2; Cherniak Decl. ¶ 1). Jacobs cited Lamberson's "terrific job" and "capable management" as justification for the requested salary increase. (Id.).

Lamberson never received the requested raise. (Lamberson Dep. p. 48). In addition, Lamberson's duties as manager of the Paris changed after May 1998; for example, Lamberson's hiring authority was revoked, he was no longer invited to meetings, and he was no longer consulted about management decisions. (Lamberson Dep. pp. 61–62, 67; Jacobs Dep. pp. 97–98). Lamberson attributes these particular changes and his eventual discharge to a particular complaint he made on June 9, 1998 regarding his employer's reassignment of an African–American employee, Derrick Caver,[1] from the position of ticket-taker to that of usher.

### 3. The Dispute Regarding Caver

Caver began work at the Paris on March 30, 1998 as a daytime ticket-taker or "greeter." A ticket-taker at the Paris is required to greet customers when they enter the theater, organize customers into lines when necessary, take customers' tickets, and answer their questions. (Def. 56.1 ¶ 12; Lamberson Dep. p. 75; Jacobs Dep. pp. 81–82). Lamberson, who at the time had independent hiring authority, selected Caver for the position because they had previously worked together at another movie theater and Lamberson knew Caver to be a "conscientious" and "reliable" em-

ployee. (Pl. 56.1 Ex. 3; Lamberson Dep. p. 209).

Sometime in April 1998, Jacobs told Lamberson that Caver didn't "look right" for the Paris and suggested that Caver shave his facial hair and make an effort at being properly attired. (Lamberson Dep. p. 209; Lamberson Aff. ¶ 3; Jacobs Dep. p. 92). In response, Lamberson told Caver he had to arrive at work clean-shaven. Caver complied. (Lamberson Dep. pp. 209–10; Jacobs Dep. pp. 93, 98). Nevertheless, at some point thereafter Sheldon Solow, owner of Six West and therefore also the Paris, saw Caver and objected to his "appearance." (Jacobs Dep. p. 114; Lamberson Aff. ¶ 5). At Solow's suggestion, Jacobs instructed Lamberson to reassign Caver to the position of usher or concessionaire. (Jacobs p. 115). Lamberson complied, transferring Caver to the position of usher. (Def. 56.1 ¶¶ 13, 14). According to defendants, Caver was reassigned both because he had an unkempt appearance and because he lacked the "outgoing" personality required for the ticket-taker position. (Jacobs Dep. pp. 99–115). The record contains conflicting evidence regarding whether Caver was in fact "outgoing." (Fusco Dep. p. 9; Patro Dep. p. 36). Caver did not complain about the reassignment or believe that he was being discriminated against; on the contrary, he was pleased with the transfer because it enabled him to work more hours and receive an increase in pay. (Caver Dep. p. 23).

As an usher, Caver was responsible for keeping the theater clean and restocking the concessions. (Jacobs Dep. p. 82). He also had duties in the lobby, including relieving ticket-takers who were "on break." (Lamberson Aff. ¶ 11; Fusco Dep. p. 11; Jacobs Dep. p. 84). Caver was in the lobby performing such duties when Jacobs and Solow attended a screening of a film at the Paris on June 8, 1998. (Compl. ¶ 25;

---

1. Caver is erroneously referred to as Derrick Carver in the complaint, answer, and many depositions.

Answer ¶ 25; Lamberson Aff. ¶¶ 10–11). Solow was "upset" to see Caver still working in the lobby of the theater. (Lamberson Aff. ¶ 10). According to Lamberson, Jacobs asked, "How do I explain to Mr. Solow that [Caver] is still here?," and instructed Lamberson to send him a memo stating why Caver should not be fired. (Lamberson Aff. ¶ 12). In addition, Jacobs gave the staff explicit instructions to keep Caver out of the lobby. (Fusco Dep. pp. 15–16; Patro Dep. p. 15). Members of the Paris staff found this unusual because Caver was the only employee not permitted to relieve the ticket-takers. (Fusco Dep. p. 11; see Patro Dep. p. 15). In addition, although Caver did not initially believe he was being discriminated against, he eventually thought his exclusion from the lobby was "strange" and had something to do with his race. (Caver Dep. pp. 30–35).

On June 9, 1998—the day after Solow and Jacobs visited the theater—Lamberson sent Jacobs a memo complaining that he was "greatly disturbed" by Caver's reassignment and the fact that Caver apparently could not "be seen in the lobby at all." (Pl. 56.1 Ex. 3). Lamberson concluded the memo by saying, "[i]t is troubling to me that the first black male that I have hired at this theatre . . . is the cause of so much unnecessary concern. . . . In fifteen years of theatre management I have never had to worry about losing a good worker for such questionable reasons." (Id.). Plaintiff copied the memo to Six West's Human Resources Department. (Lamberson Dep. p. 234).

According to Lamberson, Jacobs became "angry" that he involved Human Resources. Lamberson alleges that Jacobs called him a "do-gooder, on a crusade . . . to save the world," and that Jacobs warned him he "could be fired in connection" with the memo. (Lamberson Aff. ¶ 13; Fusco Dep. p. 25). On June 14, 1998, Lamberson

again wrote Jacobs, stating "[Caver] is the first African American male who has been hired at the Paris, and he is being judged within very ambiguous parameters of personal appearance that would be hard not to question." [2] (Pl. 56.1 Ex. 5). Apparently, no further words were exchanged on the subject.

### 4. The Sign Incident

On August 1, 1998, the film "The Governess" opened at the Paris. The film attracted a large number of patrons and, due to the crowds, Lamberson decided to delay the 9:30 p.m. showing of the film until 10:00 p.m. Accordingly, Lamberson posted a sign in the box office stating that the 9:30 p.m. showing of the film would be delayed "for reasons of safety." (Fusco Dep. p. 42; Lamberson Dep. p. 251). Tom Prassis, an executive from Sony Picture Classics (the distributor of The Governess), walked by the Paris that night and saw Lamberson's sign. (Jacobs Dep. pp. 202–04). On Monday, August 3, 1998, Prassis called Jacobs to question whether Sony had lost business as a result of the sign and whether there were safety issues at the Paris. (Prassis Dep. pp. 6–7; Jacobs Dep. pp. 201–04). There is conflicting evidence in the record regarding whether anyone also called Solow to complain about the sign. (Solow Dep. pp. 41–42; Jacobs Dep. p. 206; Affidavit of Michael Barker, annexed to Pl. 56.1).

On August 3, 1998, Jacobs told Lamberson that "from a public relations standpoint the sign could have been better phrased," but he did not fire Lamberson at that time. (Lamberson Aff. ¶ 17; Jacobs Dep. p. 205–06, 217). Sometime between August 3, 1998 and August 5, 1998, Jacobs met with Solow to discuss the sign. (Def. 56.1 ¶ 30). Solow expressed the opinion that whoever put up the sign was "irre-

---

**2.** The June 14, 1998 memo was written in response to an unsigned letter dated June 11, 1998 printed on Jacobs Entertainment stationary with the closing "Sincerely, Jeffrey," that Jacobs denies having authored. (Jacobs

Dep. pp. 182–86). The letter reiterated that Caver should be kept out of the lobby but denies any intention to fire Caver. (Def. 56.1 Ex. 6).

sponsible" and should be fired. (Solow Dep. p. 42). Defendants contend that when Solow expressed this opinion he was unaware that Lamberson posted the sign. (Solow Dep. p. 42; Cherniak Decl. ¶¶ 7–8). According to Lamberson, however, he personally told Solow on August 3, 1998 that he had been the one to post the sign. (Lamberson Aff. ¶ 17).

### 5. *Lamberson's Discharge*

On August 5, 1998, Lamberson wrote a memo in which he foreshadowed his dismissal "for using the word 'safety' on a note in the box office window." (Def. 56.1 Ex. 11). Lamberson's prediction proved to be correct; at Solow's request, Jacobs fired Lamberson later that day. (Def. 56.1, Ex. 12; Jacobs Dep. p. 117). According to Lamberson, he asked Jacobs whether he was being fired because of the sign and Jacobs replied, "unfortunately there are ongoing concerns about you upstairs. For whatever reason they are unhappy with you." (Lamberson Dep. p. 284). Jacobs testified that he agreed with Solow's decision to fire Lamberson because Lamberson had mishandled the overcrowding incident and demonstrated "anger with management." (Jacobs Dep. p. 229). Jacobs admitted that he was referring in part to Lamberson's anger regarding Caver's reassignment. (Jacob's Dep. p. 230).

### 6. *Minority Hiring at the Paris*

Caver continues to work at the Paris as an usher. (Cherniak Decl. ¶ 12; Fusco Dep. p. 25). In addition, a "substantial" number of minority employees of all races have worked at the Paris as ticket-takers, ushers, cashiers, and concessionaires. (Fusco Dep. pp. 60–63; Lamberson Dep. pp. 201–205, 211–212; Cherniak Decl. ¶ 13). With respect to the ticket-taker position in particular, it is undisputed that before Lamberson hired Caver for the job, Jacobs approved the hiring of two African–American men for the position but neither accepted the offer. (Cherniak Decl. ¶ 13; Def. 56.1 Ex. 7). Caver's vacant ticket-taker position was filled by an employee of Hispanic descent. (Cherniak Decl. ¶ 13).

### B. *Procedural History*

Plaintiff has exhausted his administrative remedies. He filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") and, as alleged in the complaint, on October 30, 1998 the EEOC issued plaintiff a right-to-sue letter. On November 10, 1998, within ninety days of receipt of the right-to-sue letter, plaintiff commenced this lawsuit. Plaintiff also filed a charge of discrimination with the New York State Division of Human Rights.

In his complaint, plaintiff alleges discrimination on the basis of race and retaliation in violation of Title VII, the New York State Human Rights Law, N.Y.Exec. Law § 296 (McKinney 1993 & Supp.2000) ("HRL"), and the New York City Human Rights Law, Administrative Code of the City of New York, § 8–101 *et seq.* ("NYCHRL"). Plaintiff seeks a declaratory judgment that defendants violated the above laws, reinstatement, actual and punitive damages, costs, and attorneys' fees.

### DISCUSSION

### A. *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record to

support a jury verdict in the nonmoving party's favor. *See id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

## B. *Title VII*

Lamberson alleges that defendants violated his rights under Title VII[3] by discriminating against him on the basis of race and retaliating against him for engaging in protected activities. The "ultimate issue" in any employment discrimination case is "whether the plaintiff has sustained [his] burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,'" *i.e.* that there was discriminatory (or retaliatory) intent. *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 119 (2d Cir.1997); *see Stratton v. Depart-*

*ment for the Aging,* 132 F.3d 869, 878 (2d Cir.1997).

### 1. *Race Discrimination*

### a. *Legal Standards*

Title VII makes it unlawful "for an employer ... to ... discharge·any individual ... because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies upon the three-step test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To establish a *prima facie* case of employment discrimination on the basis of race, a plaintiff must show "that he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class." *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000); *see Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir.2000); *Carr v. Health Ins. Plan of Greater New York, Inc.,* 111 F.Supp.2d 403, 413 (S.D.N.Y. 2000). The burden of alleging a *prima facie* case "is a minimal one." *Graham,* 230 F.3d at 38.

Second, if the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employ-

---

3. The same standards apply to employment discrimination claims brought under Title VII, New York Executive Law § 296, and the Administrative Code of the City of New York. *See Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir.1996); and *Jalal v. Columbia Univ.,* 4 F.Supp.2d 224, 232 n. 10 (S.D.N.Y.1998). Accordingly, plaintiff's state and city human rights law claims are analyzed in conjunction with his Title VII claims.

ment decision. *See Reeves,* 120 S.Ct. at 2106; *Cruz,* 202 F.3d at 567; *Minott v. The Port Authority of New York,* 116 F.Supp.2d 513, 519 (S.D.N.Y.2000). "This burden is one of production, not persuasion." *Reeves,* 120 S.Ct. at 2106; *Minott,* 116 F.Supp.2d at 519.

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's,* 509 U.S. at 510–511, 113 S.Ct. 2742; *James v. New York Racing Ass'n,* 233 F.3d 149, 154 2d Cir.2000); *Minott,* 116 F.Supp.2d at 519. The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields,* 115 F.3d at 120–21; *Connell v. Consolidated Edison Co.,* 109 F.Supp.2d 202, 207 (S.D.N.Y.2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation was false." *James,* 233 F.3d at 156. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination on the basis of race. *See James,* 233 F.3d at 156; *Connell,* 109 F.Supp.2d at 207–08.

As the Second Circuit observed in *James:* "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." 233 F.3d at 156; *see Lapsley v. Columbia University–College of Physicians and Surgeons,* 999 F.Supp. 506 (S.D.N.Y.1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination).

### b. *Application*

Here, the record does not contain sufficient evidence from which a reasonable trier of fact could draw an inference that Lamberson was discriminated against on the basis of race. Indeed, Lamberson, a Caucasian, is not himself a member of a protected class nor is he alleging reverse discrimination, *i.e.,* that he was discriminated against because he is white. *See Berkowitz v. County of Orange,* 120 F.Supp.2d 386, 397–98 (S.D.N.Y. 2000); *Olenick v. New York Tel.,* 881 F.Supp. 113, 114 (S.D.N.Y.1995).[4]

### c. *Plaintiff's Alternative Theories*

Perhaps recognizing the weakness of his race discrimination claim, plaintiff argues in his opposition papers that his "race" claim should be read as alleging a claim under Title VII for discriminatory hostile work environment and infringement upon his right to interracial association. Plaintiff's alternative theories of race discrimination fare no better.

---

4. *Berkowitz* and *Olenick* differ as to the proof a plaintiff alleging reverse discrimination must allege. *Compare Berkowitz,* 120 F.Supp.2d at 397 (rejecting *Olenick* and holding that "white persons, as a class, are protected from discrimination against that class") *with Olenick,* 881 F.Supp. at 114 (non-minority plaintiff must allege that "defendant is that 'unusual employer who discriminates against the majority' "). This conflict is irrelevant to the instant action as Lamberson is not asserting that he was discriminated against because he is Caucasian.

### i. *Hostile Environment*

■ In his opposition papers, plaintiff claims that he was subjected to a discriminatory hostile work environment because of defendants' treatment of Caver. Plaintiff's complaint is devoid of any allegations of intimidation, ridicule, or insult that would give rise to a claim for hostile work environment. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (a work environment is considered hostile "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment") (internal references omitted); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997) (to be deemed pervasive, hostile incidents "must be more than episodic; they must be sufficiently continuous and concerted") (quoting *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989)).

Even assuming the complaint could be read to assert a hostile work environment claim, plaintiff has pointed to no evidence in the record from which a reasonable jury could find that he was subjected to conduct so severe or pervasive as to create a hostile work environment. Nor has Lamberson pointed to evidence of any behavior directed at Caver or other minorities such as would rise to the level of creating an overall hostile working environment. *See Cruz*, 202 F.3d at 570 (plaintiff alleging hostile environment claim need not show that offensive remarks or behavior were "directed at individuals who are members of [his] own protected class"). The evidence merely shows that plaintiff felt "uncomfortable" interacting with Caver because of Caver's reassignment. Such evidence is insufficient to support a claim for hostile work environment under Title VII.

### ii. *Right of Association*

■ Similarly, Lamberson's complaint is devoid of allegations of infringement upon his right to interracial association. This is itself sufficient grounds for granting defendants' motion for summary judgment on this claim. Even assuming the complaint could be read to allege a claim for interference with interracial association, and further assuming (without deciding) that plaintiff has standing under Title VII to assert such a claim, *cf. Gavenda v. Orleans County*, No 97 Civ. 0074E, 1998 WL 136122, at *3–4 (W.D.N.Y. Mar.19, 1998) (permitting amendment to allege Title VII claim for associational loss resulting from the defendants' alleged discrimination against others), it is clear that plaintiff's claim based on associational loss is nevertheless untenable. There is no evidence in the record from which a reasonable jury could find that defendants deprived Lamberson of the ability to associate with minorities.[5] Lamberson's own testimony confirms that a substantial number of employees at the Paris were members of minority groups. Moreover, although Lamberson claims that defendants' actions made him "uncomfortable" with Caver and "created an unnatural barrier" between the men, the record reveals that Caver continued to work for the Paris and to socialize with Lamberson. Indeed, Caver characterizes Lamberson as his friend. (Caver Dep. p. 7). Accordingly, summary judgment is granted with respect to plaintiff's Title VII race discrimination claim.

### 2. *Retaliation*

### a. *Legal Standards*

■ Title VII also provides that "it shall be an unlawful employment practice for an

---

**5.** Many cases cited by plaintiff in support of his claim for associational loss are inapposite as plaintiff does not claim that defendants took adverse employment action against him because he associated with a minority, but rather that defendants deprived him of the ability to associate with minority employees. *See, e.g. Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878 (7th Cir.1998), *Parr v. Woodmen of the World Life. Ins. Co.*, 791 F.2d 888 (11th Cir.1986), and *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F.Supp. 298 (S.D.N.Y.1996).

employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a). The *McDonnell Douglas* burden shifting rules apply to retaliation claims; under these rules, plaintiff bears the initial burden of establishing a *prima facie* case of retaliation by showing that: "(1) [plaintiff] was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 115 (2d Cir. 2000) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993)); *see Cruz*, 202 F.3d at 566.

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. If such a reason is proffered, the burden then shifts back to the plaintiff prove the ultimate issue—whether "retaliation 'played a motivating role in, or contributed to, the employer's decision.'" *Gordon*, 232 F.3d at 117 (*quoting Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 222 (2d Cir.1997)); *see also James*, 233 F.3d at 156 (court must examine entire record to determine whether plaintiff can "satisfy ultimate burden of persuading trier of fact" defendants' actions were unlawful) (internal quotations omitted).

### b. *Application*

Defendants argue that they are entitled to summary judgment on plaintiff's retaliation claim because he has not established a *prima facie* case. I address these arguments in the context of discussing the "ultimate issue"—that is, whether plaintiff has adduced sufficient evidence to support an inference that the decision to fire him was motivated, at least in part, by an impermissible reason: defendant's desire to retaliate against him for engaging in protected activity.

### 1. *Protected Activity*

 To prove he engaged in a protected activity, plaintiff must show (1) that he opposed a practice engaged in by his employer, and (2) that he had a "good faith, reasonable belief that the underlying challenged actions of [his] employer violated the law." *Wimmer v. Suffolk County Police Dept.*, 176 F.3d 125, 134 (2nd Cir.), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999) (quoting *Manoharan v. Columbia Univ. College of Physicians*, 842 F.2d 590, 593 (2d Cir.1988)). Defendants contend that Lamberson fails on both counts. First, they argue that Lamberson did not engage in protected activity because he did not "actually accuse[ ]" his employer of violating the law. Protected oppositional activities include informal as well as formal complaints and complaints to management. *See Cruz*, 202 F.3d at 566; *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). An issue of fact exists as to whether plaintiff's June 9, 1998 and June 14, 1998 memoranda constituted protected activity. Certainly a reasonable jury could find that the fair import of the memoranda is that Lamberson believed his employer to be unfairly discriminating against Caver because of his race; indeed, the record contains evidence that defendants interpreted the memoranda in this manner. (Jacobs Dep. pp. 173–74).

 Second, defendants contend that it was not reasonable for Lamberson to believe that they engaged in unlawful discrimination by transferring Caver to the position of usher. Lamberson need not prove that defendants actually violated Title VII by reassigning Caver, however; he need prove only that, under all the circumstances, he possessed a good faith, reasonable belief that the reassignment violated Title VII. *See Wimmer*, 176 F.3d at 134;

*Galdieri–Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 292 (2d Cir.1998). The "determination of whether plaintiff's belief was reasonable and made in good faith depends in part on an assessment of plaintiff's legal sophistication. Therefore, a good faith mistake, whether of fact or law, regarding the legality of the employer's conduct will not strip the plaintiff of Title VII protection against retaliation." *Meckenberg v. New York City Off–Track Betting,* 42 F.Supp.2d 359, 380 (S.D.N.Y.1999) (citation and quotation omitted).

Lamberson has raised a triable issue as to whether he had a good faith, reasonable belief that transferring Caver was unlawful. The record contains evidence that: (1) Caver was reassigned despite his apparent compliance with Jacobs's directive that he arrive at work clean-shaven; (2) Caver—the only African–American male employee at the Paris—was the only one not permitted to replace ticket-takers or be in the lobby; (3) Jacobs instructed Lamberson to justify why Caver should not be fired for being in the lobby; and (4) Caver himself began to believe he was being treated differently because of his race. Relying on such evidence, a jury could find that Lamberson reasonably believed defendants' transfer of Caver violated Title VII.

### 2. *Causal Connection*

A plaintiff may allege proof of causation either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon,* 232 F.3d at 117. Lamberson has pointed to both indirect and direct evidence sufficient to establish a causal connection between his June 1998 complaints and his discharge.

■ Lamberson was fired approximately two months after he complained to Jacobs about Caver's reassignment and three months after Jacobs gave him a glowing review. This close temporal proximity between Lamberson's complaints and his discharge is sufficient circumstantial evidence of causation, particularly when the discharge followed so closely on the heels of a positive performance review. *See Meckenberg,* 42 F.Supp.2d at 382. In addition, Jacobs's warning that Lamberson "could be fired in connection" with the June 9, 1998 memo and his admission that management was justified in discharging Lamberson because of his anger over the Caver incident constitute direct evidence of retaliatory animus. Although defendants contend that Solow made the ultimate decision to fire Lamberson not knowing at the time that Lamberson was responsible for the ill-advised box office sign, the record contains evidence that Solow was aware of Lamberson's responsibility for the sign and that Jacobs met with Solow prior to Lamberson's termination.

This evidence, taken together, is sufficient to support an inference that, despite defendant's articulated reason for the discharge, the decision to fire Lamberson was motivated, at least in part, by retaliation. *See James,* 233 F.3d at 156; *Gordon,* 232 F.3d at 115–16; *Fields,* 115 F.3d at 120. Accordingly, summary judgment is denied with respect to Lamberson's retaliation claims.

### C. *Liability Under Title VII and New York Law*

Even though Lamberson has presented triable issues of fact sufficient to survive summary judgment on his retaliation claims, not all of the seven named defendants may be held liable on these claims. It is clear that plaintiff may maintain his claims against his employer, Six West. Plaintiff has not set forth any basis, however, for a finding of liability on behalf of Solow Management Corporation, Solow Realty & Development Company, LLC,

The Paris Theatre Company, or Jacobs Entertainment, Inc. Accordingly, they are dismissed from the action.

■ Plaintiff also alleges claims against individual defendants Jacobs and Solow. Plaintiff cannot maintain a Title VII claim against Jacobs or Solow, however, because there is no individual, supervisory liability under Title VII. *See Tomka v. Seiler,* 66 F.3d 1295, 1313 (2d Cir.1995) (individual supervisors not liable under Title VII); *Perks v. Town of Huntington,* 96 F.Supp.2d 222, 226 (E.D.N.Y.2000) (Title VII suit may not be brought against individual defendants in personal or official capacities) (citing cases); *Meckenberg,* 42 F.Supp.2d at 370 n. 2 (same). Accordingly, summary judgment is granted with respect to plaintiff's Title VII claims against Jacobs and Solow.

Because Jacobs and Solow may potentially be held liable under New York law, however, they remain in the case. *See, e.g. Tomka,* 66 F.3d at 1317 (defendant who "actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the HRL"); *Ahmed v. Compass Group,* No. 99 Civ. 10032, 2000 WL 1072299, at *5 (S.D.N.Y. Aug. 3, 2000) (individual defendant with ownership interest or power to hire and fire may be liable under HRL § 296(1) and individual defendant who "actually participates" in conduct may be liable under HRL § 296(6)); *Perks,* 96 F.Supp.2d at 228 (noting split among New York courts regarding reach of § 296(6) but following *Tomka* ); *Lewis v. Triborough Bridge and Tunnel Auth.,* 77 F.Supp.2d 376, 380 n. 6 (S.D.N.Y.1999) (same); *Sowemimo v. D.A.O.R. Sec., Inc.,* 43 F.Supp.2d 477, 487 (S.D.N.Y.1999) (defendant who actually participates in conduct may be liable under HRL and NYCHRL as an "aider and abettor"); *DeWitt v. Lieberman,* 48 F.Supp.2d 280, 293–94 (S.D.N.Y.1999) (same).

### *CONCLUSION*

For the foregoing reasons defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's claims for retaliation in violation of Title VII against Six West and for retaliation in violation of New York law against Six West, Solow, and Jacobs survive. Summary judgment is granted with respect to the remaining claims. The parties shall appear for a pretrial conference on January 5, 2001 at 10:00 a.m. in Courtroom 11A of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007.

SO ORDERED.